IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR 1 8 2019

CLERK, U.S. DISTRICT COURT
By_____
           Deputy

JEROME OVERSTREET,                §
                                  §
            Petitioner,           §
                                  §
v.                                §    No. 4:15-CV-461-A
                                  §
LORIE DAVIS, Director,            §
Texas Department of Criminal      §
Justice, Correctional             §
Institutions Division,            §
                                  §
            Respondent.           §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Jerome Overstreet, a state
prisoner confined in the Correctional Institutions Division of
the Texas Department of Criminal Justice (TDCJ), against Lorie
Davis, director of TDCJ, respondent.

Petitioner was convicted in state court of capital murder.
This case was stayed on petitioner's motion and has been held in
abeyance since January 18, 2017, pending conclusion of state
post-conviction DNA proceedings. (Order, doc. 30.) Petitioner
informs the court that the DNA proceedings have been concluded
but requests that the petition continue to be held in abeyance so
that he may "obtain an attorney of record and/or pursue his new
state legal claims" or the conclusion of the Innocence Project's
evaluation of his case. (Pet'r's Resp. 2, doc. 35.) He does not
however demonstrate that he has, in fact, initiated any

subsequent state court remedies. *See, i.e.,* TEX. CODE CRIM. PROC. ANN. arts. 11.073 & 64.05 (West 2006 & Supp. 2017); *Whitfield v. State,* 430 S.W.3d 405, 409 (Tex. Crim. App. 2014). And, following the additional DNA testing, the state informed petitioner's court-appointed attorney in that proceeding as follows:

> The Tarrant County Criminal District Attorney's Office has completed its DNA mixture interpretation review in this case. Based on our comparison of the original and amended reports as well as the other evidence supporting your client's conviction and sentence, there exists no reasonable probability that any statistical or interpretative changes impacted the case's outcome. As such our office has determined that no further action is required on our part and we are closing out this review.

(Resp't's Resp. to November 28, 2018 order, Ex. A, doc. 34.) Thus, the additional DNA testing does not significantly exculpate petitioner of capital murder. Therefore, the court ORDERS that petitioner's request to continue to hold the case in abeyance be, and is hereby, denied. The court further ORDERS that the clerk of court reopen and reinstate the case on the court's docket for further proceedings.

Having considered the pleadings, state court records, and relief sought by petitioner, the court now concludes that the petition should be denied.

## I. Factual and Procedural History

On September 24, 2009, a jury in Tarrant County, Texas, Case No. 1092061D, found petitioner guilty of capital murder and the trial court assessed an automatic life sentence. (Clerk's R. 207,

2

222-23, 303, doc. 21-18.) Petitioner's conviction was affirmed on appeal and the Texas Court of Criminal Appeals refused his petition for discretionary review. (Docket Sheet 2, doc. 21-3.) Petitioner also filed a state habeas-corpus application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (SHR-01 2-16 & Action Taken, docs. 21-30 & 21-26.[1]) This federal habeas petition followed.

The state appellate court summarized the facts of the case as follows:

> [Petitioner] was married to Vicki Overstreet. They had a rocky marriage, and according to Vicki's friends and family, [petitioner] was abusive and controlling. In September 2007, Vicki, fearing for her life, left [petitioner] and her hometown of Wichita, Kansas and moved to Texas. She wanted to make a clean break from [petitioner], but after some time in Texas, she began talking to [petitioner] again. He started occasionally visiting her on weekends at her apartment in Texas.
>
> On Wednesday, November 6, 2007, Vicki told her sister Tammy Foster that she planned to tell [petitioner] that she did not want to reconcile with him. On Thursday, Vicki told Tammy that when she broke the news to [petitioner], he became angry. That same day, Vicki talked to her daughter, Melissa Collins. Vicki told Melissa about her argument with [petitioner] and said that [petitioner] had told her that he was coming to Texas to get her.
>
> Vicki did not show up for work on Friday or Saturday. Melissa was unable to reach her mother over the weekend, so she called [petitioner] and asked if he had visited Vicki over the weekend; [petitioner] told

---

[1] "SHR-01" refers to petitioner's state habeas proceeding in WR-83,105-01.

Melissa that he had not been in Texas and had not spoken to Vicki. [Petitioner] also told Vicki's son Lamont Webb that he had not talked to Vicki since the prior Thursday.

When Vicki did not show up for work on Monday morning, her employer called the police. Police officers went to her apartment to check on her. Her door was locked, so they got a key from management. The officers found Vicki lying dead on the floor in her apartment. Her face was scratched, blood had run down her cheek from her left nostril, and her forehead and eye sockets were severely bruised. Her stomach was discolored and appeared to be bruised, her pants and underwear were down around her mid thighs, and her shirt was raised to expose the bottom half of her bra. Her left thigh appeared to have a bruise in the shape of a hand impression on it, and her wrists and arms were bruised. Officers saw traces of tape adhesive on her wrists and arms, but they did not find any tape in her apartment. The officers suspected that Vicki had been sexually assaulted.

The carpet appeared as if it had been freshly vacuumed because there were vacuum markings on it, yet officers could not find a vacuum in the apartment. In the bathroom trashcan, officers found a grocery store receipt from a nearby Kroger store in Euless that was for the purchase of a bottle of Riunite wine on Friday, November 9, 2007. The purchaser had used a debit card that was registered to [petitioner]. A surveillance video from the Kroger store taken on November 9 confirmed that [petitioner] had made the purchase. The bottle of wine was not found in the apartment. One wine glass was on the kitchen counter, and officers also found a box for two wine glasses matching the description of the glass they found, but they did not find the other matching glass.

Cell phone tower records for [petitioner]'s mobile phone number showed that, on Friday, November 9, phone calls were made from that number in Wichita at 6:13 a.m. and 6:50 a.m.; in Southaven, Kansas at 10:17 a.m.; in Edmond, Oklahoma at 11:49 a.m.; in Sanger, Texas at 2:31 p.m.; and in Euless at 3:46 p.m. Several calls were made in the Euless area from that afternoon until 1:26 a.m. on Saturday morning, and the next call was not made until 7:39 a.m. on Saturday morning from

Springer, Texas. By 12:08 p.m., calls were made from the Wichita area. According to [petitioner]'s employer, [petitioner] clocked in to work on Wednesday, November 7, took vacation days on November 8 and 9, and next clocked in on Monday, November 12.

Euless detective Tony Bennett went to Wichita and interviewed [petitioner]. [Petitioner] told Bennett that he had last spoken with Vicki on Friday, November 9, by telephone. Euless police officers worked with Wichita police officers to obtain a warrant to search [petitioner]'s house in Wichita. From [petitioner]'s house, officers seized a bottle of Riunite wine, a canister to a Dirt Devil vacuum, keys, papers with [petitioner]'s name on them, and an insurance policy in Vicki's name.

Crime lab testing on the contents of the vacuum's canister showed that carpet fibers and glitter found in the canister were chemically and microscopically the same as the carpet fibers and glitter found in the carpet of Vicki's apartment. Testing of three sections of carpet taken from Vicki's apartment showed a "strong presence" of semen; [petitioner]'s DNA was an identical match to the semen on two of the carpet cuttings, as well as to semen found on a pillowcase taken from the apartment. A partial male DNA profile was found on a second pillowcase, which had been lying on Vicki's body when officers found her; the majority of [petitioner]'s DNA profile was present in the mixture on that pillowcase.

An examination of Vicki's body showed signs that Vicki's mouth and nose had been smothered and that Vicki may have been strangled. The medical examiner also saw evidence that Vicki had suffered blunt force trauma on her head, chest, abdomen, and thighs. The bruising on Vicki's thighs was consistent with someone forcing her legs apart. The medical examiner opined that Vicki had died of traumatic asphyxia. Vaginal swabs collected from Vicki's body tested weakly positive for semen, but further "confirmatory test[s]" were negative for semen.

(Mem. Op. 2–5, doc. 21-5.)

## II. Issues

Petitioner raises eight grounds for relief, which fall into the following categories:

    (1)   actual innocence (ground two);
    (2)   sufficiency of the evidence (grounds three and four); and
    (3)   ineffective assistance of counsel (grounds one, five, six, seven, and eight).

(Pet. 6.1–6.8, doc. 1.[2])

## III. Rule 5 Statement

Respondent believes that petitioner has sufficiently exhausted his state court remedies as to the claims raised, save for ground number eight, which is raised for the first time in this federal habeas petition. Respondent does not otherwise believe that the petition is barred by limitations or subject to the successive-petition bar. (Resp't's Answer 3.) 28 U.S.C. §§ 2244(b), (d) & 2254(b)(1).

## IV. Legal Standard for Granting Habeas Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an

---

[2]To the extent petitioner raises new claims or legal arguments in his reply brief, they are not addressed. Under the orders of the court and the rules governing habeas actions, a petitioner cannot raise new claims in reply to the respondent's answer.

unreasonable application of clearly established federal law as
established by the United States Supreme Court or that is based
on an unreasonable determination of the facts in light of the
record before the state court. 28 U.S.C. § 2254(d)(1)-(2);
*Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is
difficult to meet and "stops short of imposing a complete bar on
federal court relitigation of claims already rejected in state
proceedings." *Richter*, 562 U.S. at 102.

The statute further requires that federal courts give great
deference to a state court's factual findings. *Hill v. Johnson,*
210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides
that a determination of a factual issue made by a state court
shall be presumed to be correct. The petitioner has the burden of
rebutting the presumption of correctness by clear and convincing
evidence. See 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537
U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399
(2000).

Furthermore, when the most recent state court to consider a
constitutional issue provides a "reasoned opinion," a federal
habeas-corpus court must "review[] the specific reasons given by
the state court and defer[] to those reasons if they are
reasonable." *Wilson v. Sellers,* — U.S. —, 138 S. Ct. 1188,
1191-92 (2018). If the opinion was made without a written
explanation, a federal court should "'look through' the

7

unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Id.* In other words, federal habeas-corpus courts confronted with an unexplained state court decision "are to 'look through' the decision to an earlier state court opinion and presume that the earlier one provides the relevant rationale." *Thomas v. Vannoy,* 898 F.3d 561, 568 (5th Cir. 2018) (citing *Wilson,* 138 S. Ct. at 1192).

## V. Discussion

### (1) Actual Innocence

Under his second ground, petitioner claims that he is actually innocent of the offense. (Pet. 6.2, doc. 1.) A stand alone claim of "actual innocence" is itself not an independent ground for habeas-corpus relief. *Herrera v. Collins,* 506 U.S. 390, 400 (1993); *Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006); *Dowthitt v. Johnson,* 230 F.3d 733, 741-42 (5th Cir. 2000). The United States Supreme Court reaffirmed in *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013), that it has not resolved whether a prisoner may be entitled to habeas-corpus relief based on a freestanding claim of actual innocence. Until that time, such a claim it not cognizable on federal habeas review under Fifth Circuit law. *See Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006).

## 2. Sufficiency of the Evidence

Under his third and fourth grounds, petitioner claims that the evidence was legally insufficient to prove beyond a reasonable doubt his identity as the perpetrator or that he committed sexual assault or attempted to commit sexual assault. (Pet. 6.3-6.4, doc. 1.) A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense. *Foy v. Donnelly,* 959 F.2d 1307, 1313 (5th Cir. 1992). Federal courts, nevertheless, have extremely limited habeas review of claims based on the sufficiency of the evidence. When reviewing such claims, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). When faced with a record of historical facts that supports conflicting inferences federal courts must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Id.* at 326. Under *Jackson,* both direct and circumstantial evidence can contribute to the sufficiency of evidence and circumstantial evidence alone may be enough to support the conviction. *Schrader v. Whitley,* 904 F.2d

282, 287 (5th Cir. 1990). Where a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993).

Applying the *Jackson* standard and applicable state law, the state appellate court addressed the claims as follows:

### A. Legal Sufficiency Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. The trier of fact is the sole judge of the weight and credibility of the evidence. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. Instead, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution.

### B. Law on Capital Murder

A person commits the offense of capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit aggravated sexual assault. A person commits the offense of aggravated sexual assault if he intentionally or knowingly causes the penetration of the anus or female sexual organ of another by any means without the person's consent and if, in the course of the same

criminal episode, he causes serious bodily injury or attempts to cause the death of the victim.

## C. Sufficiency of the Evidence to Prove Capital Murder

[Petitioner] argues that the evidence is insufficient to connect him to Vicki's death and that "[a]t best, the State proved that [he] visited [Vicki] on the weekend she was killed and took some items with him when he left." [Petitioner] argues that the evidence is insufficient to prove that he committed the violent acts necessary to commit the offense of aggravated sexual assault as an element of capital murder.

The evidence presented at trial establishes that [petitioner] drove to Euless on Friday morning, making various calls along the way and arriving sometime between 2:30 and 3:45 p.m. [Petitioner] purchased a bottle of wine at a store near Vicki's apartment around 3:30 p.m. that day, and the receipt for the wine ended up in a trash can in Vicki's apartment. However, when Vicki's daughter and son talked to [petitioner] the following Monday, he told them that he had not been to see Vicki over the weekend. He told Lamont that he had not talked to Vicki since the prior Thursday, so Lamont was surprised when he saw the surveillance videotape of [petitioner] leaving the grocery store in Texas that Friday afternoon. [Petitioner] also told Detective Bennett that he had last spoken with Vicki on Friday by telephone. Thus, the evidence establishes that [petitioner] went to see Vicki in Euless the weekend that Vicki was murdered and that he lied to her family and the police about being there.

The evidence also establishes that [petitioner] and Vicki had a rocky marriage and that he was abusive towards her. Elaine Garcia, Vicki's friend and hairstylist, testified about an incident that occurred sometime around Christmas 2005 while Elaine was doing Vicki's hair at her house in Wichita. When [petitioner] arrived home, Vicki asked Elaine not to leave her alone with him. Vicki followed Elaine outside when she was leaving, telling [petitioner] that she was helping Elaine carry her things to her car. [Petitioner] began yelling at Vicki, so she got in the car with Elaine and left with no purse, phone, keys, or coat, despite the 13 or 14 degree weather.

11

Vicki's longtime friend, Dorothea Gamble, testified that [petitioner] was controlling over and abusive toward Vicki. Dorothea explained that Vicki had stayed with her in August 2007 after she secretly left [petitioner]. The weekend before Vicki's death, Vicki told Dorothea that [petitioner] had visited her in Texas a few times.

Vicki's son Lamont testified that his mother and [petitioner] had a rocky marriage and that Vicki had stayed with Lamont for a brief period before she moved to Texas. During that time, he or his wife would physically escort her to and from her car and their apartment. According to Lamont, Vicki changed her phone number and planned to move to Texas without telling [petitioner]. However, Vicki later told Lamont that [petitioner] had visited her in Texas on weekends.

Vicki's sister and daughter both testified that a few days before Vicki's death, she and [petitioner] had argued on the phone. According to Tammy, Vicki told [petitioner] on Wednesday or Thursday that she did not want to reconcile with him, and [petitioner] got angry at Vicki. Vicki sounded fearful and stressed when she talked to Tammy. According to Melissa, [petitioner] told Vicki on Thursday that he was coming to Texas to get her.

When police discovered Vicki dead in her apartment, there were no signs of forced entry, and the deadbolt on her door and all of the windows were locked. A vacuum found in [petitioner]'s house contained carpet fibers and glitter matching those found in Vicki's apartment. [Petitioner]'s DNA matched semen found on carpet cuttings and two pillowcases—one of which was found on Vicki's body—taken from her apartment.

Based on the evidence presented at trial, a rational jury could have concluded that [petitioner] intentionally caused Vicki's death.

A rational jury also could have concluded that [petitioner] had sex with Vicki without her consent and suffocated her in the course of the same criminal episode. [Petitioner] admits that "a fair analysis of the evidence indicates that he had sex with [Vicki] sometime prior to her death," but he argues that

12

insufficient evidence shows that he committed the necessary violent acts for aggravated sexual assault. But in addition to [petitioner]'s semen found on the carpet around Vicki's body, Vicki's clothing was in disarray, with her underwear pulled down to her mid thighs, and there were multiple bruises on her body, including bruises on her thighs consistent with someone forcing her legs apart.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that [petitioner] murdered Vicki while in the course of committing or attempting to commit aggravated sexual assault.

(Mem. Op. 5-10, doc. 21-5.)

Clearly, the state court applied the correct clearly established federal law as set out in *Jackson v. Virginia*, and its application to the evidence, both direct and circumstantial, is not objectively unreasonable. As noted by the state court, it was the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. "The *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins,* 506 U.S. 390, 402 (1993)).

Petitioner focuses on an alleged lack of physical evidence connecting him to the crime. However, the lack of physical evidence itself does not render the evidence insufficient to

13

support petitioner's guilt beyond a reasonable doubt. The state presented ample circumstantial evidenceof his guilt, including evidence related to petitioner's history of threatening and abusive behavior towards the victim and her fear of him; petitioner's proximity to the crime scene and his lies to the victim's children and law enforcement concerning his whereabouts; the absence of forced entry into the victim's apartment; and the physical trauma to the victim's thighs, her state of dress, and the presence of petitioner's semen around the body of the victim. This evidence viewed in the light most favorable to the verdict was sufficient for the jury to rationally conclude that petitioner was the person who murdered the victim in the course of committing or attempting to commit aggravated sexual assault on her.

## 3. Effective Assistance of Trial Counsel

Under his first, fifth, sixth, seventh, and eight grounds, petitioner claims that he received ineffective assistance of counsel at trial and on appeal. (Pet. 7, 6.5-6.8, doc. 1.). A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). To establish ineffective assistance of counsel, a petitioner must show (1)

that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1). *See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where the state courts have adjudicated the ineffective-assistance claims on the merits, this court must review the petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases, the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Richter,* 562 U.S. at 105.

Petitioner claims that his trial counsel was ineffective by failing to (1) demonstrate that he was actually innocent through

his cell phone records; (2) consult an expert in preparation for trial or cross-examination of the state's expert witnesses; (3) conduct a reasonable investigation into the state's "medical findings" and contact a forensic pathologist to review those findings; and (4) "challenge the constitutionality of the search warrant, jurisdiction, or probable cause." (Pet. 6.1, 6.5-6.7, doc. 1.) In support of his second and/or third claims, petitioner presented the affidavit of Dr. Harry Bonnell, a licensed forensic pathologist, in which he states (any spelling, punctuation, and/or grammatical errors are in the orginal)—

5.     In preparing this affidavit, I reviewed the trial testimony transcript of:

- Aliece Watts, pages 73-127 inclusive
- Lloyd White, M.D., pages 1-22 inclusive
- Amy Smuts, pages 23-65 inclusive
- Patricia Eddings, pages 66-133 inclusive[.]

6.     Had I been contacted by defense counsel and based on my education, training and experience, and my review of these materials, I would have testified that it is my opinion to a reasonable degree of medical certainty that:

- As testified to by Dr. White on page 21, DNA is easily transferred from one surface to another; therefore it would be expected that DNA from [petitioner] would be on the items in the apartment of his wife, whom he had visited more than a dozen times on weekends.

- As testified to by Ms Smuts on pages 61-62, there is no way to determine how long the DNA may have been present on these items.

- Dr. White did not present any factual evidence or findings to support the diagnosis of traumatic asphyxia by smothering or compression of the chest; both of these diagnoses are nearly

impossible to make in a body as decomposed as he
describes.

- Bruising to the abdomen is caused by compressing
  the abdominal skin and musculature against the
  spine; if the discoloration were bruising, there
  would have been severe trauma to the internal
  organs, which he does not mention.

- In a decomposed the body, the standard is to
  obtain a vitreous (eye fluid) sample to determine
  alcohol content concentration since eye fluid is
  protected from fermentation; this was not done and
  therefore he speculates about the reason for
  alcohol being found in the blood.

- Dr. White testified (page 3) that he is certified
  by the American Board of Pathology in the
  specialties of anatomic and clinical pathology and
  the subspecialty of forensic pathology; a search
  of the web site of the American Board of Medical
  Specialties for all physicians in Texas with a
  last name of White revealed none that are
  certified by the American Board of Pathology in
  forensic pathology.

- Had I been able to also review the autopsy report,
  autopsy photos and scene photos, I would have been
  able to be more helpful to defense counsel and his
  client.

(SHR-01 70-71, doc. 21-30.)

The state habeas judge, who also presided at petitioner's

trial, conducted a hearing by affidavit and trial counsel, Steven

King, responded to the allegations as follows (any spelling,

punctuation, and/or grammatical errors are in the original):

This is my response to [petitioner]'s Application for
Writ of Habeas Corpus. I was hired to represent
[petitioner] on December 5, 2007 to represent him for
the offense of murder of his estranged wife. The
Tarrant County grand jury indicted [petitioner] for
Capital Murder, and the State of Texas waived the death
penalty. I discussed this case several times with

[petitioner]. Each time he said he was in Kansas when his wife was murdered in Texas. I asked him for names and contact information for witnesses that could substantiate that he was not in Texas. He told me that he didn't have any alibi witnesses. [Petitioner] gave me the contact information for Shawndrika Webb (the victim's ex daughter in law). I called her as a witness at trial. [Petitioner] also gave me contact information for Ronnie Walker at Sprint. [Petitioner] said he could be a character witness. I called Mr. Walker, and he said he would not be a good witness for [petitioner]. [Petitioner] also wanted me to talk to his parents. He wanted them to be at his trial and he wanted one of them to testify at his trial as a character witness. Although [petitioner]'s parents came to Fort Worth once before trial, his father informed me that they would not be able to make it back for trial. They lived in California at the time. Since [petitioner] was convicted, the sentence was automatic life, and character witnesses were irrelevant.

I talked to Dr. Lloyd White of the Tarrant County Medical Examiner's Office about his autopsy and findings in this case. I also talked to Patricia Eddings of the Tarrant County Medical Examiner's Office regarding the carpet fiber analysis done in this case. In addition, I hired my own expert to review Patricia Eddings bench notes and her report. After my expert reviewed her work, my expert informed me that the carpet fiber analysis was done appropriately, and we would not be able to impeach the findings. Therefore, I did not call that expert as a witness. I also drafted and filed a motion to suppress the items found in [petitioner]'s house in Wichita Kansas. [Petitioner] had one witness he wanted me to call: Shawndrika Webb. That was the ex-wife daughter in law of the victim. [Petitioner] said she could testify to the ongoing hostile relationship between the victim's family and [petitioner]. I took the necessary steps to have her subpoenaed as an out of state witness, and I did call her as a witness at the trial.

**Ground One:** Ineffective assistance of counsel because trial counsel failed to demonstrate that [petitioner] was actually innocent.

**Response:** The State did offer evidence that the victim died sometime between Friday, November 9 to

Sunday, November 11. The State also offered evidence
that [petitioner] made a purchase at a Kroger store
near the victim's apartment in Euless, Texas during the
above time span. The State also offered evidence
showing [petitioner]'s cell phone travelled from the
Wichita, Kansas area to the Euless, Texas area and back
between November 9th through the 10th. The cell phone
records show calls made, not conversations as
[petitioner] says in his Application. No evidence was
offered to show that the victim actually used her phone
to make or receive a call and was still alive on
November 10. I did offer evidence that the Euless
Police Department found the doors locked and the lights
off when they entered the victim's apartment. I also
asked Petra Blake about what she saw on Saturday
November 10 about 9 p.m. Petra Blake testified that she
saw the light on in the victim's apartment. The State
claimed [petitioner] was already on his way back to
Kansas. I argued that in my final argument. I told the
jury that according to the State's own cell tower
records that [petitioner] was back in Kansas by noon on
Saturday. I further argued that Petra Blake saw the
victim's car trunk open and her apartment light on
Saturday. The State never responded to that argument in
their closing argument. Therefore, I am of the opinion
that the jury chose to disregard that argument in light
of the overwhelming amount of scientific evidence put
forth by the State that put [petitioner] at the scene
of the crime during the time span of the victim's
death. In my opinion, the grounds offered by
[petitioner] do not amount to actual innocence.

**Ground Five:** Defense Counsel's failure to consult a
medical expert.

**Response:** I discussed this case with Dr. Lloyd
White before trial. I felt that obtaining a medical
expert to refute Dr. White would be a waste of time and
resources. [Petitioner] insisted that he was in Kansas
when the victim was murdered. Therefore, the factual
and legal issues regarding the defense theory was
alibi, not manner of death. I did not investigate Dr.
White's background, and I have no knowledge whether he
misrepresented his board certification.

**Ground Six:** Defense counsel's failure to investigate
the manner of victim's death and failure to hire a
forensic pathologist rendering ineffective assistance

of counsel.

**Response:** [Petitioner] admits himself that the "only significant factor to be decided at trial would be who caused Vikky's death." I agree. I disagree that the way to find that person was to establish the manner of death. The all important issue was whether [petitioner] was still in the Euless area during the time frame of the victim's death. However, [petitioner] never provided me with the name of an alibi witness or any other evidence to prove where [petitioner] was to refute the State's theory that he drove down from Kansas to Texas Friday and headed back to Kansas in the early morning hours of Saturday. Manner of death simply does not tend to prove or disprove that issue. The fact that [petitioner]'s DNA was found around the victim's body, might have some tendency to prove [petitioner] was at the apartment and was present during the victim's murder. However, the State's witness admitted they could not tell how long the DNA had been there. In addition, Petra Blake testified that she had seen [petitioner] with the victim several different weekends prior to the weekend of the murder. She testified that she saw [petitioner] arrive Friday nights and that he would leave Monday mornings. That testimony left the impression that the couple could have had sex in the apartment. Furthermore, [petitioner] told me that he had had sex with the victim in the apartment, and he did not dispute that his DNA would be found where it was. Therefore, there was no need for a DNA expert for the defense.

**Ground Seven:** Trial counsel's ineffective assistance of counsel for failing to determine whether the State of Texas had probable cause where the affiant believed that an offense had been committed against laws of the State of Kansas and for failing to challenge the constitutionality, jurisdiction or probable cause of the search warrant executed in Kansas at [petitioner]'s home.

**Response:** The search warrant and affidavit in question are contained in 8 RR 57. I believe the facts set out in the affidavit established probable cause that an offense had been committed in the State of Texas, and that evidence of that offense could be found at the home of [petitioner] in Wichita Kansas. However, I did file and present a motion to suppress that

warrant. The court heard evidence regarding the matter
and examined the warrant and affidavit in support
thereof. The Court denied the motion to suppress. The
affidavit underlying the warrant was sponsored by
Robert Chisolm, a detective for the Wichita Kansas
police department. The warrant was signed by a district
judge from the 18th Judicial District of Kansas.
Therefore, jurisdiction was not an issue. I also raised
federal and state constitutional issues of search and
seizure in my motion to suppress. The Court overruled
those issues by denying my motion to suppress.

(SHR-01 96-100, doc. 21-30 (record citations omitted).)

Based on counsel's affidavit, which the court found
credible, the documentary record, and his own recollection of
counsel's performance at trial, the state habeas judge entered
the following factual findings, which although numerous are
included to assist the reader:

5.     Hon. King discussed the case with [petitioner]
       several times before trial.

6.     Hon. King asked [petitioner] for names and contact
       information for witnesses that could substantiate
       that he was not in Texas at the time of the
       offense.

7.     [Petitioner] told Hon. King that he did not have
       any alibi witnesses.

8.     [Petitioner] gave Hon. King contact information
       for Shawndrika Webb whom Hon. King called to
       testify at trial.

9.     [Petitioner] gave Hon. King contact information
       for Ronnie Walker but Mr. Walker indicated that he
       would not be a good witness for [petitioner].

10.    Hon. King spoke with [petitioner]'s parents but
       they informed him that he would be unable to make
       it back from California, where they lived, for
       trial.

11.    Because [petitioner] was facing an automatic life

sentence if convicted, there would not have been a punishment hearing and, therefore, no need for character witnesses.

12. Hon. King interviewed Dr. Lloyd White about his autopsy and findings in this case.

13. Hon. King interviewed Patricia Eddings regarding the carpet fiber analysis done in this case.

14. Hon. King requested, and was appointed, an expert.

15. After his expert reviewed Patricia Eddings' work, his expert informed Hon. King that the carpet fiber analysis was done appropriately and that her findings were unimpeachable.

16. Hon. King concluded that an expert witness would not benefit [petitioner]'s defense.

17. Hon. King's decision to not call an expert witness to testify was the result of reasonable trial strategy.

18. Hon. King filed a motion to suppress the items found in [petitioner]'s house in Wichita, Kansas.

19. The State presented evidence that [petitioner] made a purchase at a Kroger store near the victim's apartment in Euless, Texas, during the time he was supposed to be in Kansas.

20. The cell phone records showed that the victim's phone received calls and not that she answered the phone.

21. Hon. King concluded that no evidence was offered to show that the victim actually used her phone or was still alive on November 10.

22. Hon. King offered evidence that law enforcement found the doors locked and the lights off when they entered the victim's apartment.

23. Hon. King presented evidence that the victim's light was on in her apartment.

24. Hon. King argued in final argument that the

victim's light was on and her car trunk was open after [petitioner] was on his way back to Kansas based on the cellphone records.

25. Hon. King's chosen defense was the result of reasonable trial strategy.

26. Based on his discussion with Dr. Lloyd White, Hon. King concluded that hiring a medical expert to refute Dr. White would have been a waste of time and resources.

27. Hon. King concluded that the important issue at trial was whether [petitioner] was still in Euless at the time of the victim's death.

28. Because [petitioner] never provided Hon. King with alibi witnesses or evidence to prove he was in Kansas, Hon. King had nothing to refute the State's theory that [petitioner] drove down from Kansas to Texas Friday and headed back to Kansas m the early morning hours of Saturday.

29. Hon. King concluded that the manner of death would not tend to prove or disprove [petitioner] was in Texas at the time of the victim's death.

30. Hon. King's decision to not attack the State's theory on the manner of death was the result of reasonable trial strategy.

31. Because the factual and legal issues at trial were the defense theory of alibi and not the manner of death, and there was no evidence that such testimony would be helpful, Hon. King's decision to not hire a medical expert was the result of reasonable trial strategy.

32. Dr. Robert Lloyd White has worked as a Tarrant County deputy medical examiner since 2005.

33. Dr. White has medical specialty certifications in anatomic pathology, clinical pathology, and forensic pathology through the American Board of Pathology.

34. Dr. White properly testified as to his certifications.

35. [Petitioner]'s DNA was found at the apartment but Petra Blake testified that [petitioner] would stay with the victim on weekends.

36. Because the State's witness testified that they could not tell how long [petitioner]'s DNA had been in the apartment, and there was an innocent reason for the presence of [petitioner]'s DNA, Hon. King concluded there was no need for a DNA expert.

37. Hon. King's decision to not hire a DNA expert was the result of reasonable trial strategy.

38. Hon. King filed a motion to suppress the fruits of the Kansas search warrant and affidavit.

39. Hon. King concluded that affidavit established probable cause that an offense had been committed in Texas and that evidence of that offense could be found at [petitioner]'s home in Wichita, Kansas.

40. The affidavit was sponsored by a detective with the Wichita police department and signed by a district judge in Kansas; thus, Hon. King concluded that jurisdiction was not an issue.

41. Hon. King's decision to not attack the search warrant and affidavit because it alleged "Kansas" was the result of reasonable trial strategy.

       . . .

43. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different but for the alleged misconduct.

(SHR-01 116-20, doc. 21-30 (record citations omitted).)

Based on its findings, and applying the *Strickland* standard, the state habeas court concluded that petitioner had failed to prove that counsel's representation was deficient or that but for counsel's acts or omissions there was a reasonable

likelihood that the outcome of his trial would have been different. (Id. at 122-24.) The Texas Court of Criminal Appeals later adopted the habeas court's findings in denying relief.

Petitioner fails to present clear and convincing evidence to rebut the state courts' factual findings; thus, deferring to those findings, the state courts' rejection of the claims was not unreasonable. Petitioner's claims are conclusory, refuted by the record, involve strategic and tactical decisions made by counsel, or would have required counsel to make futile or frivolous objections or motions, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (providing strategic decisions by counsel are "virtually unchallengeable" and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Green v. Johnson,* 160 F.3d 1029, 1037, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"); *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990) ( providing "[t]his Court has made clear that counsel is not required to make futile motions or objections.").

Finally, under his eighth ground, petitioner claims that his appellate counsel was ineffective by failing to obtain a complete trial record on appeal—*i.e.,* certain photographic exhibits

introduced by the state at trial. (Pet. 6,8, doc. 1.) Respondent asserts that this claim is unexhausted and procedurally barred from the court's review. (Resp't's Answer 3, doc. 22.) The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest court of the state on direct appeal or in state post-conviction proceedings. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 842-48 (1999); *Fisher v. Texas,* 169 F.3d 295, 301 (5th Cir. 1999). The exhaustion requirement is "not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition." *Anderson v. Johnson,* 338 F.3d 381, 386 (5th Cir. 2003). "A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997) (citing *Coleman v. Thompson,* 501 U.S. 722, 735 n.1 (1991)). If petitioner presented his unexhausted claim at this time to the Texas Court of Criminal Appeals in another state habeas application, the court would find the claims to be procedurally barred under the Texas abuse-of-the-writ doctrine. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 § 4(1)-(2); *Ex parte Whiteside,* 12 S.W.3d 819, 821 (Tex. Crim. App. 2000). This doctrine is an adequate and independent state ground for the

purpose of imposing a procedural bar on federal habeas review. *See Hughes v. Quarterman,* 530 F.3d 336, 342 (5th Cir. 2008).

Petitioner may overcome a procedural default by demonstrating either cause and actual prejudice for the default or a showing that he is actually innocent of the crime for which he stands convicted. *See Sawyer v. Whitley,* 505 U.S. 333, 338 (1992)*; Ylst v. Nunnemaker,* 501 U.S. 797, 801-07 (1991); *Smith v. Johnson,* 216 F.3d 521, 523-24 (5th Cir. 2000). Petitioner acknowledges that he raises this claim for the first time in his federal petition but asserts that the failure to exhaust was the result of state habeas counsel's failure to bring the claim; thus, he brings the claim now pursuant to *Trevino v. Thaler,* 569 U.S. 413 (2013). (Pet. 8, doc. 1.) The record does not reflect that petitioner was represented by counsel in his state habeas proceeding. Nevertheless, the *Martinez/Trevino* line of cases does not extend to defaulted claims of ineffective assistance of appellate counsel. *Davila v. Davis,* --- U.S. ---, 137 S. Ct. 2058, 2065 (2017). And, petitioner does not otherwise demonstrate cause and prejudice or a colorable claim of actual innocence. According, his eighth ground is procedurally barred from the court's review.

For the reasons discussed,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,

denied. The court further ORDERS that a certificate of
appealability be, and is hereby, denied, as petitioner has not
made a substantial showing of the denial of a constitutional
right or that the court's procedural ruling(s) are debatable or
wrong.

SIGNED April __18__, 2019.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE